Bruce I. Afran (BA 8583)
Attorney at Law
10 Braeburn Drive
Princeton, New Jersey 08540
609-924-2075

Attorney for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------
AIRFRAME SYSTEMS, INC. f/k/a
AIRLINE SOFTWARE, INC.,                    Case No:

       Plaintiff,

       v.                                   Complaint

L-3 COMMUNICATIONS CORPORATION,            Civil Action

       Defendant.                           Jury Trial Demanded
---------------------------------------------------------

       Plaintiff AIRFRAME SYSTEMS, INC., by its attorney Bruce I. Afran, asserts as follows:

**Parties, Jurisdiction and Venue**

       1.  Plaintiff (hereafter "Airframe"), formerly known as Airline Software, Inc., is a corporation organized under the laws of the State of Delaware and is authorized to conduct business in the State of New York.  In December 2004 plaintiff changed its name to Airframe Systems, Inc., which is the name used in this instant complaint.

       2.  Defendant L-3 Communications Corporation (L3), is a corporation organized under the laws of the State of Delaware with its principal place of business in the City of New York, County of New York.

3. Jurisdiction is properly vested in this Court pursuant to 28 U.S.C. 1331 by virtue of a federal question arising under the Copyright Act, 17 U.S.C. Sec. 101, et seq.

4. Venue is properly vested in the Southern District of New York by virtue of the plaintiff and defendant's principal place of business being situated in this District.

## **Factual Background**

5. Airframe is a software maker and developer engaged in the production and licensing of aircraft maintenance and engineering software.

6. Airframe's products are licensed to airlines and to firms engaged in aircraft maintenance and aircraft modification and to providers of aircraft maintenance and engineering services.

7. Beginning in 1981, Airframe first marketed its software programs which are designed to enable airlines as well as firms engaged in aircraft maintenance and aircraft modification to maintain and operate an automated system of maintenance, recordkeeping and engineering services.

8. Airplane maintenance is the most critical of all safety factors in the operation of passenger and cargo airlines as well as for firms engaged in performing aircraft maintenance and aircraft modification.

9. Airframe's services are principally marketed to companies maintaining air fleets, including passenger airlines, freight airlines and contractors responsible for management of civilian and/or military aircraft maintenance and aircraft modification.

10. Airframe markets several suites of software directed to several product areas: maintenance, engineering, marketing, scheduling, reservations and flight operations.  A

software "suite" is the industry term for a package of programs intended for retail use by the ultimate consumer for a specified purpose.

11. Airframe's individual product suites are sold as separate software packages, each with a separate renewable license.

12. Airframe's individual suite products emanate and arise out of source code developed and owned by Airframe.

13. Source code is the originating body of software that gives rise to multiple independent software programs.

14. A licensed software program can be modified only by use of the source code; source code is typically retained by a software developer as a competitive tool on which to premise modifications and updates to individual licensed programs.

15. Software developers guard their source code as highly valued proprietary technology. See e.g., *Softel, Inc. v. Dragan Medical and Scientific Communications, Inc.*, 118 F.3d 955 (2d Cir. 1997) ("Dragon hired Fiondella to write computer code for this project. Fiondella was careful not to provide his source code to Dragon…").

16. Because its possession would enable a client to develop their own software programming and modifications, software developers typically license source code only in exchange for a substantial and extraordinary consideration, i.e., a reasonable royalty rate applied to gross revenues of the customer's applicable operation.

17. Source code is typically the result of many years, often decades, of investment and development by the software maker and represents the maker's largest and most significant asset.

18. Airframe's source code began development in or about 1979 and has been continually adjusted, modified and expanded and represents a unique and valuable intangible intellectual asset.

19. Due to its status as the ultimate creative product offered to the market by a software maker, source code is never given by the maker free of charge to a customer and is never transferred except for a fair market exchange, a fact known and understood by knowledgeable technical users of software.

20. In or about 1997, L3 purchased a license from Airframe for a portion of the Airframe Maintenance and Engineering software suite.

21. The Maintenance and Engineering suite was a software package that enabled users to regulate, manage and evaluate the servicing and maintenance of airliner fleets, an essential component of L3's business.

22. L3 provides maintenance, servicing and modifications for a fleet of U.S. government aircraft used for both military and civilian purposes.

23. L3 purchased the Maintenance and Engineering suite to facilitate its maintenance and servicing operations.  L3 agreed to pay an annual license fee of Ten Thousand dollars ($10,000) renewable annually for the Maintenance and Engineering suite.

24. The Maintenance and Engineering suite is a software product sold as a separate and distinct entity apart from the source code; although the Maintenance and Engineering Suite derives ultimately from the source code, it operates independently of the source code -- a licensee of the Maintenance and Engineering suite does not require access to the source code for program operations.

25. Throughout its relationship with Airframe, L3 paid for and licensed only the Maintenance and Engineering suite and, in addition, a single use, one time license for Y2K application; L3 contracted for, paid for and licensed no other software systems from Airframe.

26. At no time did L3 contract for, pay for or license Airframe's source code.

27. On or about September 1, 2003, Airframe learned for the first time that L3 had come into possession and had acquired Airframe's source code.

28. Airframe's principal, Gordon Rosen, observed the source code in L3's computer library on or about September 1, 2003 at a time when he was given access by L3 to L3's computer network to assist L3 in diagnosing a purported malfunction in Airframe's Maintenance and Engineering software suite; Rosen observed the source code in L3's computer library in the course of seeking out the location of Airframe's Maintenance and Engineering software on L3's system for the purpose of identifying software errors.

29. At all times during this examination, Rosen was on-line contemporaneously with L3's manager, Hector Arce, who also observed the source code entry in L3's computer library.

30. Following this observation, Rosen immediately asked Hector Arce why the Airframe source code was in L3's computer library.  Arce did not answer Rosen at the time but said he would inquire as to the origin of the placement of Airframe's source code in L3's library.

31. Several days later, Airframe received a reply from L3 acknowledging that the source code had been installed on its computer system.

32. By memorandum dated September 10, 2003, J.R. Barnett, Manager of L3's Proprietary Programs department, stated:

"L3 Communications Integrated Systems did not install the source code recently discovered on the ASI application software.  The only individual that may have installed the source code was the ASI employee Mr. John Stolarz.  Mr. Stolarz came to the company to install the application software.  He is the only ASI employee that has installed the ASI software at this location."

33. The memorandum further stated that "L-3 Communications Integrated Systems has not distributed any copies of the source code to any other person or organization."

34.  John Stolarz, the Airframe employee referred to in L3's memorandum, had no authority to install Airframe's source code on L3's system and L3 and its manager knew or should have known that any such installation violated ordinary business practices under which source code is sold or transferred for a substantial consideration, i.e., a reasonable royalty based upon gross revenues of the customer's applicable operation, in this case L3's Aircraft and Modification Segment.

35. L3 knew or should have known that it did not pay Airframe for the source code and that such code would not ordinarily be installed on a client's computer system without payment of an extraordinary license fee predicated upon said reasonable royalty.

36. Airframe's source code, once installed, would enable L3 to modify, change and update Airframe's licensed software without recourse to Airframe and would also enable L3 to adapt the source code so that it could develop customized computer software systems for each aircraft modification project it undertook with either the U.S.

government, foreign governments and/or civilian aircraft owners through its Aviation Products & Aircraft Modification Segment without paying Airframe.  This is a significant benefit to L3 that L3 knew or should have known would not have been conferred by Airframe without entering into an annual license agreement that would have included a substantial annual royalty.

37. The acquisition by L3 of the source code was a valuable proprietary asset obtained by L3 without payment of consideration to Airframe.

38. L3 knew or should have known that its acquisition of the source code without payment of very substantial consideration predicated upon a license and royalty was against ordinary trade usage and represented the conversion, theft and infringement of Airframe's valuable intellectual property.

**As and for a First Cause of Action**

39.  Each and every allegation set forth above is repeated herein as if more fully set forth below.

40. Beginning in or about 1981, Airframe, under its predecessor's name, began to register the source code under the United States copyright laws. See registration certificates, annexed hereto.

41. The most recent registration of the source code was made effective on April 16, 2004, as certified by the United States Copyright Office.  Airframe presently holds copyright registration certificates for the source code bearing registration numbers 137065044, 137065022, 137065033, 136193581, 137065055, 137065011.

42. On or about September 1, 2003, Airframe learned for the first time that L3 had come into possession of and had acquired Airframe's source code.

43. L3's possession and acquisition of the source code was without legal right or privilege and was done without contract or other agreement with Airframe.

44. L3 has no right or claim of possession or custody over Airframe's source code and has at all times been without a right or claim of possession or custody over Airframe's source code.

45. L3 acquired said source code without license or other grant of right by Airframe.

46. L3's license agreement for Airframe's Maintenance and Engineering software conveys no rights in or to Airframe's source code.

47. L3's possession and acquisition of the source code is illegal and infringes on Airframe's rights as the copyright holder.

48. Airframe's source code is a valuable property and has value to L3.

49. Airframe would not license its source code to an entity such as L3 without payment of a substantial and extraordinary annual royalty.

50. L3 paid no fee and made no agreement to acquire Airframe's source code.

51. L3 is liable in compensatory damages premised upon a reasonable royalty to Airframe pursuant to the Copyright Act, 17 U.S.C. 504, along with punitive damages, attorney's fees, interest and cost of suit.

## As and for a Second Cause of Action

52. Each and every allegation set forth above is repeated herein as if more fully set forth below.

53. L3 converted Airframe's intellectual property in the form of the Airframe source code.

54. L3 admits that it is in possession of the source code.

55. L3's acquisition of the source code was unlawful.

56. Airframe on no occasion sold, transferred or in any other manner granted a right to possession of the source code to L3 and made no agreement for the exchange of consideration for the source code.

57. L3 knew or should have known that it was in unlawful possession of the source code and that it had not contracted with a willing seller or transferor to acquire said intellectual property.

58. L3 acquired said source code without any lawful right or claim to said intangible intellectual property.

59. As reasonable knowledgeable technical users of software, L3 knew or should have known that source code is transferred only in return for substantial and extraordinary consideration.

60. L3 converted Airframe's source code and is liable in compensatory damages to Airframe for a reasonable royalty, along with punitive damages, attorney's fees, interest and cost of suit.

**As and for a Third Cause of Action**

61. Each and every allegation set forth above is repeated herein as if more fully set forth below.

62. L3's acts, as set forth in this instant complaint, comprise an illegal acquisition of Airframe's intellectual property, the principle asset of Airframe.

63. L3 knew or should have known that it possessed no right or claim to the source code and that it had made no agreement of any kind with Airframe for the transfer of the source.

64. L3, as a sophisticated actor in the intellectual property marketplace, knew that source code is not transferred except in exchange for very substantial and/or extraordinary consideration.

65. L3 knew that it had made no agreement for the transfer or conveyance of the source code and that possession of the source code would enable L3 to modify, improve and adapt Airframe's intellectual property without the knowledge or consent of Airframe and without payment to Airframe.

66. L3 made no voluntary disclosure to Airframe as to L3's receipt of the source code but continued to hold the source code surreptitiously with no disclosure to Airframe.

67. L3's actions amount to the secretive and deceptive theft of Airframe's intellectual property.

68. L3's theft of the property is in consequence of an act of industrial espionage directed against Airframe.

69. Under these circumstances, L3 has violated the Deceptive Practices Act, New York General Business Law, Sec. 349 (h).

70. Accordingly, Airframe has been injured by virtue of L3's violation of the G.B.L., Sec. 349 (h) for monetary damages in an amount equal to a reasonable royalty, along with interest, attorney's fees and costs of suit.

## As and for a Fourth Cause of Action

71. Each and every allegation set forth above is repeated herein as if more fully set forth below.

72. Under New York law, a trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Restatement of Torts § 757 cmt. b, at 5 (1939) (quoted in *Ashland Management, Inc. v. Janien*, 82 N.Y.2d 395 (1993) ).

73. Airframe's source code is a trade secret that embodies the entire asset value of Airframe's airline software products.

74. Airframe maintains its source code as a trade secret, the disclosure of which would enable others in the marketplace to reproduce Airframe's retail software and to modify and improve Airframe's software without recourse to Airframe.

75. Airframe's source code is maintained as a secret and is kept off the market; absent the theft of the source code or its sale by Airframe, the source code cannot be obtained.

76. Possession of the source code would enable L3 to develop its own software without the expense, time and delay of development and without the need to assemble, train and facilitate an in-house team of software developers.

77. L3 obtained the Airframe source code under circumstances of deception and surreptitious conduct.

78. Accordingly, L3's acquisition of the source code is in violation of New York's substantive law of trade secrets for which L3 is liable in both compensatory and punitive damages, along with interest, attorneys fees and costs of suit.

## As and for a Fifth Cause of Action

79. Each and every allegation set forth above is repeated herein as if more fully set forth below.

80. L3 asserts in its September 10, 2003 memorandum that the software was installed through the purported medium of John Stolarz, a former Airframe employee. *See Memorandum of John Barnett III, dated September 10, 2003, annexed hereto*.  Such assertion is false in that neither Stolarz nor any other third party could install source code onto L3's networks without the active participation of L3's agents, officers or employees acting in concert with Stolarz or such third party.

81. L3's computer systems, networks and libraries require special security clearance for entry.

82. Such clearance comes about solely through the express consent and active intervention of L3 and its employees, agents or officers.

83. Stolarz could not enter L3's computer systems without the express intervention and assistance of L3's employees, agents or officers.

84. Any installation by Stolarz of Airframe's source code came about through the active and affirmative participation of L3 and its employees, agents or officers who gave Stolarz clearance to enter L3's protected computer networks and facilities and facilitated such entry.

85. Clearance for entry would not have been given to Stolarz unless L3 and its employees, agents or officers knew and understood the purpose of such entry.

86. Under L3's operating procedures, Stolarz would not be permitted entry to L3's computer systems in the absence of contemporaneous and simultaneous observation and monitoring by an L3 employee, agent or officer.

87. Any installation of the source code required the active participation and knowledge of L3 and its employees, agents or officers.

88. L3's employees, agents or officers knew or should have known that they had no right or claim of right to possession of Airframe's software.

89. As a reasonable and sophisticated business actor, L3 knew or should have known that Stolarz had a duty of loyalty to Airframe to protect and guard its intellectual property from conversion, theft or infringement.

90. L3's actions in facilitating and participating in any transfer of the source code comprise deliberate and knowing interference with Stolarz' duty of loyalty and honesty to Airframe.

91. Consequently, L3 is liable in compensatory and punitive damages to Airframe for L3's tortious, knowing and deliberate interference with Stolarz' duty of honesty and loyalty to Airframe, along with attorney's fees, interest and cost of suit.

### As and for a Sixth Cause of Action

92. Each and every allegation set forth above is repeated herein as if more fully set forth below.

93. Prior to approximately September 1, 2003, L3 failed to disclose to Airframe that L3 was in possession of Airframe's source code.

94. In, and in connection with, certain license renewal periods prior to September 2003, L3 contracted for the sum of ten thousand dollars ($10,000) to Airframe for certain annual renewals of the Maintenance and Engineering suite that L3 had licensed from Airframe.

95. Airframe repeatedly accepted and/or agreed to said consideration by L3 for said license renewals based upon the understanding that L3 was in possession and custody solely of the Maintenance and Engineering suite.

96. At no time prior to approximately September 1, 2003 did L3 disclose to Airframe that L3 was in possession of Airframe's source code.

97. Airframe's source code is substantially and exponentially more valuable than the individual Maintenance and Engineering suite for which L3 repeatedly contracted for the ten thousand dollar ($10,000) annual consideration.

98. Airframe agreed in connection with each of these renewals to said ten thousand dollar ($10,000) annual consideration based on the belief that L3 was in possession solely of Airframe's Maintenance and Engineering suite.

99. L3's failure to disclose in connection with these renewals that it was in possession of Airframe's source code induced Airframe to negotiate and/or accept renewal fees based upon the reasonable value solely of the Maintenance and Engineering Suite which was substantially and exponentially less than the reasonably royalty value of the source code.

100. L3's repeated failure to disclose that it was in possession of Airframe's source code comprise material omissions on which Airframe has relied to its detriment and loss.

14

101.   Accordingly, L3 is liable in fraud to Airframe for the reasonable royalty for said source code for the renewal periods prior to September 2003 for which L3 was in possession of Airframe's source code, along with punitive damages, interest, cost of suit and attorneys fees.

### As and for a Seventh Cause of Action

102.   Each and every allegation set forth above is repeated herein as if more fully set forth below.

103.   L3 acquired Airframe's source code without right or claim of right and in a manner that was illicit and in violation of Airframe's rights.

104.   As a knowledgeable technical user of software, L3 knew or should have known that source code is a valuable asset of a software developer and that source code is transferred in the marketplace only in exchange for substantial and extraordinary consideration paid by the transferee.

105.   L3 had made no contract or other agreement to acquire source code from Airframe and paid no consideration for said exchange and knew or should have known that it was acquiring said source code in the absence of good faith, arms length consideration.

106.   L3 knew or should have known that the transfer of said source code under such circumstances was illicit, in violation of U.S. civil and criminal copyright laws, in violation of New York law governing the theft of trade secrets, was a conversion and theft and was contrary to Airframe's rights as the owner of said intellectual property.

107.   Upon being informed by Rosen that L3 was in illegal possession of Airframe's source code, Hector Arce, the L3 manager in charge of the Airframe

relationship, denied that he had been employed by L3 at the time the source code came into L3's possession; however, Airframe has since learned that Arce was in fact employed by L3 at the time of the illicit transfer of the source code. Arce's attempt to deny responsibility for the transfer of the source code further underscores the illicit nature of L3's acquisition of Airframe's intellectual property.

108. In its memorandum dated September 10, 2003, L3 attempts to suggest that the source code could have been installed on its system only by John Stolarz, a former employee of Airframe who was Airframe's liaison with L3 until his discharge.

109. L3's September 10, 2003 memorandum seeks to imply that L3 did not participate in the installation of the source code and that such installation was the unilateral action of Stolarz, the former Airframe employee.

110. Such assertion, i.e., that L3 did not participate in the installation of the source code on L3's computer system, is false and misleading and L3's attempt to so imply is a deception: L3's computer systems are protected from external interference and intrusion from all third parties; by way of example, Rosen, the owner of Airframe, was required to obtain special security clearance before he was permitted to enter L3's computer system on or about September 1, 2003 when the source code was first discovered in L3's library by Airframe; at all times during his access to L3's computer network Rosen was monitored by L3 personnel.

111. Similarly, Stolarz could not have entered L3's computer network without special clearance from L3; it would have been impossible for Stolarz, an Airframe employee, to have installed the source code without the active participation, assistance and cooperation of L3 personnel.

16

112. Assuming, *arguendo*, that Stolarz participated in the installation of the source code as L3 suggests in its memorandum, L3's employees necessarily conspired with Stolarz to give him security clearance to make the installation, which L3's employees knew or should have known was without consideration to Airframe, without payment to Airframe of a fair market, arms length royalty, and without claim of right by L3; L3 knew or should have known that any such installation with or without the aid of Stolarz was in violation of Airframe's rights in that Airframe had made no contract with L3 for the sale of source code and that L3 had paid no fair market arms length consideration for the source code.

113. Accordingly, L3's employees and agents knowingly conspired to take possession and custody of Airframe source code which they knew or should have known would ordinarily be sold in the market for a substantial and extraordinary consideration, that no consideration was paid, that L3 had no contract or other claim of right or entitlement to the source code and that said actions on behalf of L3 violated federal copyright laws and state common laws governing intellectual property.

114. By taking possession of Airframe's source code, L3 gave itself, without payment of consideration and without disclosure to Airframe, the capacity to modify, improve and replicate Airframe's retail software without recourse to Airframe and without payment of the extensive development costs that Airframe has incurred since 1981 to develop the source code.

115. L3's conduct at all relevant times in regard to its possession of the source code has been deceptive, surreptitious and dishonest.

116.   Accordingly, L3 is liable to Airframe for punitive damages on the First, Second, Fourth, Fifth and Sixth causes of action, along with attorney's fees, interest and cost of suit, based upon and arising out of the assertions in this seventh cause of action in addition to any assertions concerning or relating to punitive damages set forth independently on the preceding causes of action.

WHEREFORE, plaintiff seeks judgment against defendant for damages as a result of defendant's infringement of plaintiff's copyrights, conversion of plaintiff's proprietary source code, defendant's theft of plaintiff's trade secrets, and tortious interference, as follows:

1) On the First Cause of Action for violation of the Copyright Act for compensatory damages in an amount equal to a reasonably royalty, along with interest, attorney's fees and cost of suit;

2) On the Second Cause of Action for conversion in an amount equal to a reasonably royalty, along with interest, attorney's fees and cost of suit;

3) On the Third Cause of Action under the New York Deceptive Practices Act, GBL, Section 349, for compensatory damages in an amount equal to a reasonably royalty, along with interest, attorney's fees and cost of suit;

4) On the Fourth Cause of Action for violation of New York's substantive law governing trade secrets in an amount equal to a reasonably royalty, along with interest, attorney's fees and cost of suit;

5) On the Fifth Cause of Action for tortious interference for unstated monetary damages, along with interest, attorney's fees and cost of suit;

6) On the Sixth Cause of Action in fraud for compensatory and punitive damages, along with interest, attorney's fees and cost of suit;

7) On the First, Second, Fourth, Fifth and Sixth causes of action for punitive damages, along with interest, attorney's fees and cost of suit.

WHEREFORE, plaintiff respectfully requests that judgment be entered on the foregoing causes of action and for such additional relief as to the Court may seem just and proper.

Respectfully submitted,

_____

Bruce I. Afran
Attorney for Plaintiff
10 Braeburn Drive
Princeton, New Jersey 08540
609-924-2075

BA 8583